UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. 2:22-cr-00185 |
| | § | |
| TERRENCE JAMES BRUGGEMAN | § | |

**DEFENDANT'S POST HEARING BRIEF IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS**

Defendant TERRANCE JAMES BRUGGEMAN ("Defendant" or "Bruggeman") files this post-hearing brief in support of Defendant's motion to suppress all evidence that was seized pursuant to the search warrant issued on March 3, 2022.

### I. Summary of Defendant's Points

1.1     Defendant will show in this memorandum the following:

a.     Agent Guardado's testimony was either intentionally or recklessly misleading, especially with the statement in Paragraph 11 of his affidavit ("Agent Affidavit"). For example, he stated that other agents out of the Laredo office "noted several discrepancies between the two signatures" of Ruiz and the issue of the Form 4473 of the man known as Juan Pablo Sanchez. (See Paragraph 3.4 below for further explanation.) In reality, both the signatures and photographs appear very similar on the identification documents presented by the buyers to Mr. Bruggeman in connection with the firearms purchases, and a reasonable person would not doubt their authenticity.

b.     The sole focus of the Government's application for the search warrant were the allegations of "knowing and intentional" aiding by Defendant in "straw purchases." Agent

1

Guardado's warrant affidavit and his testimony substantiate the Defendant's legality and correctness in following the prescribed ATF procedures relative to firearms sales that were the subject of the search warrant. The allegations in the warrant that were offered in support of the search were based on speculation and conjecture by the agent as to what was "possible" cause as to Defendant as opposed to "probable" cause based upon evidence.

    c.       Analysis of the case law relevant to "straw purchase" does not reveal situations where a licensed federal firearms dealer who correctly followed all the steps involved in consummating a firearms sale was charged and convicted as an aider or conspirator of persons making straw purchases *unless* there were compelling evidence that demonstrated knowledge of illegality by the purchasers on the part of the dealer. No such evidence exists in this case that justifies the warrant—the allegation as to Defendant being based on "belief," what was "possible," and conjecture without sufficient factual support.

    d.       The scope of the warrant and seizure of Mr. Bruggeman's property (all shop firearms, all computers, all cell phones, all personal records, and more) was overly broad and greatly exceeded the scope of the warrant which was targeting evidence of straw purchases.

    1.2     Defense counsel will attempt to avoid repetition of case law and analysis of the Agent Affidavit set forth in previous motion and memoranda. However, since the Government argues that the agent handling the warrant application acted "in good faith," some case law analysis and, most important, factual analysis needs to be undertaken considering the courtroom testimony of agent Guardado.

## II. The Government's Position and the Straw Purchase Focus

2.1     **The Government Argument.**  In the hearing on the Defendant's motion to suppress, government counsel argued that the agent acted "in good faith" and ignored "reckless disregard for the truth."  However, in its memorandum by way of response to the Defendant's motion to suppress, the Government argued that Defendant has failed to make a "'substantial preliminary showing' that (1) the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in the affidavit, and (2) the remaining portion of the affidavit is insufficient to support a finding of probable cause." (citing *Franks v. Delaware*, 438 U.S. 154 (1978) at 171.) (See Doc 44, page 3, first paragraph of Government's Response to Defendant's Motion to Suppress).

2.2     **"Good Faith" Insufficient, even if true, in this case.**  "Good faith" by an agent is not sufficient to sustain a warrant if the evidence is inadequate and, especially, if the agent either was not truthful or was reckless in his statements and omissions of material facts. In this regard, the Fifth Circuit in *Winfrey v. Rogers,* 901 F.3d 483 (5th Cir. 2018) analyzed standards in light of *Franks* and found a constitutional violation where a deputy officer made false statements ***through omitting material facts*** in his affidavit. The court stated:

> "Yet, we must proceed further to the second prong of *Franks* in order to resolve whether 'the allegedly false statement is necessary to the finding of probable cause," as required by the *Franks* analysis. 438 U.S. at 156. To determine whether the false statement was necessary for this finding, *Franks* requires us to consider the faulty affidavit as if those errors and omissions were removed. We then must examine the "corrected affidavit" and determine whether probable cause for the issuance of the warrant survives the deleted false statements and material omissions. See *Franks*, 438 U.S. at 156 (saying that courts must excise false statements); *United States v. Bankston*, 182 F.3d 296, 305-06 (5th Cir. 1999) (applying Franks to omissions and using a corrected affidavit that 'contain[ed] the allegedly exculpatory conversation' to determine whether that affidavit would establish probable cause to authorize electronic surveillance), overruled on other grounds by *Cleveland v. United States*, 531 U.S. 12, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000). The warrant will be valid only if the corrected affidavit establishes probable cause for Junior's arrest."

If we delete the false and/or misleading statements, incorrect statements, ***conjecture,*** and material omissions from the Agent Affidavit, coupled with his testimony, we can see that the warrant should not have been issued.

    2.3    **Straw Purchase "defined."**  The relevant statutes do not define what is a "straw purchase."  In *Abramski v. United States*, 573 U.S. 169, 178-182 (2014), the Supreme Court recognized that 18 U.S.C. 922 (a) (6) does not have a precise definition of what constitutes a "straw purchase." Therefore, *Abramski* dealt with the issue of what is a "straw purchase."  In its analysis, the Supreme Court states the following:

> "Start with the parts of §922 enabling a dealer to verify whether a buyer is legally eligible to own a firearm. That task, as noted earlier, begins with identification—requesting the name, address, and age of the potential purchaser and checking his photo ID. See §§922(b)(5), (t)(1)(C). And that identification in turn permits a background check: The dealer runs the purchaser's name through the NICS database to discover whether he is, for example, a felon, drug addict, or mentally ill person. *Id*. at 181.

The opinion approaches a firearm purchase from the point of view of the buyer who is acquiring the firearm, on one hand, and the dealer on the other, who sells it. The dealer follows the meticulous record-keeping and reporting required, and the buyer must truthfully and accurately fill out the forms. Emphasis is placed upon completing the forms accurately and truthfully. The Supreme Court also noted that there are exceptions within the "straw purchase" concept. For example, one may receive a firearm as a gift from a private party on the secondary market. "The individual who sends a straw to a gun store to buy a firearm *is* transacting with the dealer, in every way but the most formal; and that distinguishes such a person from one who buys a gun, or receives a gun as a gift, from a private party." *Id. at* 186.

### III. The "straw purchase" focus of the warrant and the agent's testimony.

3.1 **To be a gift or not to be a gift?** In the Agent Affidavit, Mr. Guardado states that "BRUGGEMAN stated that UF had indicated that she was purchasing one of the firearms for herself and one for Sanchez." (Agent Affidavit, par. 17). One could interpret that in one of three ways – either UF was going to make it a gift, in which case it would not be a straw purchase, or UF was going to purchase it on behalf of Sanchez, in which case it would be a straw purchase, OR UF was going to pay for it, but the transfer would be to "Sanchez," which would be a gray area. In either case, no transfer was made, *the transaction had not been consummated,* and Bruggeman was forthcoming about the nature of the anticipated transaction – that is, he was doing exactly what a dealer should do as set forth in *Abramski*. However, instead of giving a cooperative dealer the benefit of doubt as to a transaction that had not been concluded, the agent inserts that scenario into his affidavit as alleged grounds for Bruggeman to be "knowingly" participating in a straw purchase operation. This situation is not one where straw purchasers were acquiring a multitude of firearms for resale and/or delivery into Mexico another country. To the contrary, it is a situation where a small number of purchases were made from a small dealer who would be an easier ATF target than an Academy Sporting Goods or similar enterprise where the "appearance" of a vehicle in a crowded parking lot or a firearms customer speaking Spanish would never become an issue.

3.2 **The Agent Affidavit "Bruggeman was knowledgeable" allegation**. As stated in prior memorandums, the entire focus of the affiant agent's Search Warrant Affidavit ("Agent Affidavit") is the allegation "that violations of title 18 U.S.C.§922(g)(5)(B) . . . have been committed by Terrence J. Bruggeman…." (Agent affidavit, paragraph 4). Also, see paragraph 4 of the Agent Affidavit in which violations are listed as being Title 18 U.S.C. 922(g)(5)(B), 18 U.S.C. 922(a)(6), and 18 U.S.C. 544-(a).

Further, in Paragraph 35 of the Agent Affidavit the agent states:

"I believe BRUGGEMAN had knowledge that the firearm purchases conducted by LANDAVERDE-Sosa were in violation of the Gun Control Act. Agents also believe that the two firearms BRUGGEMAN was [sic] intending to transfer was also being done in violation of the Gun Control Act, and that BRUGGEMAN was knowledgeable of the 'straw purchase' attempt. I believe that probable cause exists, there are additional firearms and evidence of BRUGGEMANS violations at the **TARGET RESIDENCE.** Agents believe that BRUGGEMAN has received and continues to receive items at the **TARGET RESIDENCE** which show his involvement and that of others involved in the alleged violations."

There was no support in the foregoing statement as to specific "additional firearms and evidence" which would indicate the "believed" violations. Additional firearms would obviously be on the premises. After all, BRUGGEMAN was a licensed firearm dealer.

  3.3 **Foundation for Agent's "belief" NOT supported.**  For reasons set forth below in the analysis of the agent's testimony, the defense will show that the foundation for the agent's "belief" "that BRUGGEMAN was knowledgeable of the 'straw purchase' attempt" is severely lacking.

  a. The fact that there was evidence set forth in the affidavit relative to illegal conduct by LANDAVERDE-Sosa, Leo Barroso, and Brenda Ruiz does not transfer to Mr. Bruggeman who, even Agent Guardado acknowledged, did everything correct, proper, and legal relative to following the procedures and forms for an FFL dealer.  Agent Guardado acknowledged that each transaction with the alleged straw purchasers was correctly done and reported.  Before closing the sale Mr. Bruggeman sent to the NCIS the identity of the purchasers and was authorized to "proceed." (See Defendant's Hearing Exhibit 5.)  In fact, the multiple firearm sales were reported by Mr. Bruggeman on ATF Form 3310, thereby leading the agents into the investigation of the buyers. (See Hearing Exhibit 7 and  Tr. Day 1: p. 31, ll.

6

8-22; p. 22, ll.1-12; p. 20, ll 11-24).[1]

      b.      The following testimony by Agent Guardado are the reasons for his "belief" as to Bruggeman's "knowing" conduct was based on *possibilities* instead of facts to support probable cause.

<u>By Mr. Watt:</u>

    Q    ***Is it possible*** for an FFL to submit what appears to be valid paperwork in violation of the law? [Emphasis added]

    A    Yes.

    Q    Did you -- do you believe that telling Judge Libby that the defendant submitted what appeared to be valid paperwork had any bearing on whether or not there was evidence of a crime at the location?

    A    No.

        THE COURT: ***So the basis for alleging that this defendant had violated the law was that you thought he knew what was going on here?*** [Emphasis added.]

        THE WITNESS: ***To a certain extent, yes.*** Because he was allowing a straw purchase, and the people that were committing the offenses -- there was a statement made that there was a prior agreement or there was some kind of arrangement made, is what one of the persons indicated, the witness that was interviewed.

(Tr. Day 2: pp.55, ll. 3-19)

Again, "possible" is not "probable" and, therefore, does not arise to the level of showing "probable cause."

    3.4    **<u>Agent statements as to identification of documents and not having seen them before doing affidavit.</u>**

---

[1] Reference to "Day 1" refers to the first day of hearing on March 21, 2023 and "Day 2" refers to the second hearing day on March 23.

At the beginning of the hearing, despite having been given three prior requests for discovery, Government counsel provided to defense counsel for the first time the document attached hereto as **Exhibit 1**. This document is a Form 4473 with Texas driver's license photo identification related to a firearm purchase by the man named "Juan Pablo Sanchez" (now believed to be Barroso). Defense counsel showed the document (which counsel believes was marked Exhibit 7A) to Agent Guardado and attempted to question him about it. However, there was some confusion in the examination by both counsel for the defense and the government as to whether the document was a "multiple sales form" (Form 3310.4), or a Form 4473 executed by "Sanchez."

Agent Guardado testified he had not seen the multiple sales form before and, therefore, the Court did not admit the document. Either way, **Exhibit 1** (believed to have been Exhibit 7A in the hearing) was significant because, once again, it bears the signature of "Sanchez" on both a Form 4473 and his driver's license. Upon examination, the signatures appear to be almost identical.

Also, regardless of whether Agent Guardado did not have the opportunity to review a multiple sales form before submitting his affidavit, he did have the opportunity to review signatures of Sanchez at the time he interviewed Defendant because, in Paragraph 17 of the Agent Affidavit, he states the following:

> "According to BRUGGEMAN, the male subject was identified upon completing the Form 4473 for the purchase of the firearm. Agents reviewed the alleged firearm transaction and identified the male subject as Juan Pablo Sanchez."

Based upon the foregoing, and to eliminate any confusion regarding the (1) identification of the document defense counsel believes was previously marked as Exhibit 7A

and (2) whether it should have been admitted or not admitted, defense counsel moves for admission of the document attached hereto as **Exhibit 1** for purposes of this hearing. For purposes of the record, such document may be admitted as Exhibit 20 since the last admitted document was Exhibit 19.

      3.5    **The issue regarding signatures of purchasers.**

Agent Guardado in Paragraph 11 of his affidavit tells the magistrate that "Agents noted several discrepancies between the two signatures and ended the interview after agreeing with Ruiz to stay in touch if any additional information developed." The point of this was obviously to indicate that Defendant "should have" known the buyers were straw purchasers. Further, he basically lays off the signature issue on the Laredo agents. But, in his affidavit, Guardado talks about Defendant providing information regarding the subject firearm purchases—hence, Guardado reviewed the forms provided by Defendant. Also, he testified in the hearing that he had seen the Ruiz signatures "once—because we had the 4473s, and at the time, I had a—not her signature, handwritten signature, but I mean I was comparing it to the driver's license." (Tr. Day 1: p. 85, ll. 1-7). In his affidavit, Guardado talks about Defendant providing information regarding the subject firearm purchases.

As noted by the Court, while comparing the signatures on Personal Identification Card for Ruiz with her Form 4473, "the signatures kind of look similar." (Tr. Day 2: p. 25, ll. 11-15).

      3.6    <u>**The significance of the handwriting issues.**</u>  In paragraph 14 of the Agent Affidavit, Mr. Guardado stated as follows:

"BRUGGEMAN then stated that on a second occasion, UF arrived at the Target

9

Residence with another Hispanic male further identified by UF as her 'Boss'. According to BRUGGEMAN, the male subject was identified upon completing ATF Form 4473 for the purchase of a firearm. ***Agents reviewed the alleged firearm transaction and identified the male subject as Juan Pablo Sanchez (hereinafter "Sanchez") with a date of birth as XX-XX-XXXX, and a residential address as [redacted in this memorandum . . . ."*** [Emphasis added]

Agent Guardado wrote a report describing his interview with Mr. Bruggeman on February 28, 2022, which report was provided to defense counsel at the beginning of the hearing. Agent Guardado described his visit to the Defendant's shop and his interview with Defendant. The agent states in paragraph "g" on page 2 of his report the same identical verbiage quoted above from Paragraph 14 of the Agent Affidavit. The significance of the Form 4473 (Exhibit 1) is simply (1) that Mr. "Sanchez" handwriting appeared to be almost identical on both the driver's license submitted in connection with the purchase and his signature on the Form 4473 and (2) Agent Guardado misled the Court in his testimony when he recklessly and/or intentionally pointed to the alleged signature "discrepancies." Therefore, using signature "discrepancies" as evidence of probable cause should be eliminated from the Agent Affidavit.

3.7  **Additional defects in agent's presumption of "knowledge":** In day two of the hearing testimony as to the basis for the agent's presumption of "knowledge" on the part of defendant was as follows:

Agent Guardado acknowledged that a "gift" would not be a straw purchase.

"Q: Okay. In other words, if it were a gift, then that would alter the scenario slightly. In other words, someone could buy a firearm, and if it's a legitimate gift, they could give it to someone else. Would you agree?

A Correct. There are some scenarios where that could happen."

(Tr. Day 1: p. 14-15, ll. 23-24; p. 15. ll. 1-4)

10

    3.8    **Agent's incorrect assumption of "knowledge" on the part of Bruggeman That There Was A Straw Purchase.**

In the Agent Affidavit, Mr. Guardado states that "I believe BRUGGEMAN had knowledge that the firearm purchases conducted by LANDAVERDE-Sosa were in violation of the Gun Control Act, and that BRUGGEMAN was knowledgeable of the 'straw purchase; attempt. . . Agents believe that BRUGGEMAN has received and continues to receive items at the **Target Residence** which show his involvement and that of others involved in the alleged violations." (Agent Affidavit, par.35.)

    a.    Agent Guardado's states in his affidavit that Defendant "stated that UF and Sanchez were driving a vehicle that did not appear to be U.S. made. BRUGGEMAN indicated that the vehicle appeared to be manufactured in Mexico, and that the license plates on the vehicle also appeared to be from Mexico." (Agent Affidavit, paragraph 15) Additionally, Agent Guardado stated in his affidavit "that UF had indicated that she was purchasing one of the firearms for herself and one for Sanchez." The sale had not been consummated and it was either a "gift" or not a "gift"—therefore, as evidence of "probable cause" as to Bruggeman it should be discounted.

    b.    Since Bruggeman's paperwork meticulously followed ATF guidelines in all respects relative to the purchase of the firearms, the alleged statements set forth in paragraph 3.7 above appear to be the agent's ground for inferring knowledge on the part of Bruggeman. If, in fact, as the affidavit states, UF (LANDAVERDE-Sosa) was purchasing the firearm for another person, then such purchase could equally be presumed to be a "gift" that would not be deemed a "straw purchase" as indicated by Agent Guardado in his testimony plus rules and regulations to that effect is disseminated by ATF. As pointed out in the hearing for the Court,

11

the speculation that a vehicle may not appear to be made in the United States or may have had Mexican license plates is not probative of a straw purchase since such description could fit any number of vehicles in South Texas.

      c.      Further, the fact that LANDAVERDE-Sosa was a person "turned away" at the U.S. Mexican border "for alleged involvement in the illegal purchasing of firearms," does not infer knowledge on the part of Defendant when the Agent Affidavit and his testimony acknowledged that the Personal Identification card used by her in connection with the purchase was legitimate-- apparently, having been "loaned" by Brenda Ruiz to a friend, Barroso, who was posing as Juan Pablo Sanchez. In short, LANDAVERDE admitted to the following crimes: illegal entry into the United States for the purpose of purchasing firearms; using another person's identification make the purchases; and submitting a false statement on the form 4473 when she did not admit to being an alien. Meanwhile, LANDAVERDE's statements were made to border agents, and she is obviously not available for cross examination. Even if everything LANDAVERDE-Sosa said was true, it does not impute knowledge to Defendant.

      d.      As for Brenda Ruiz, the Agent Affidavit contains conflicting stories by her as to the utilization of her Personal Identification Card. First, she allegedly stated that she her card had been stolen (Paragraph 10 of Agent Affidavit); then, she stated that she allowed Leo Barroso to have the information to assist with "her residential energy consumption provider;" then, she denied letting "Leo" have her social security card information. (Agent Affidavit, Paragraphs 23-24). Again, Ruiz appeared to be lying to an agent because of her contradictory stories and the fact that her social security card information was on the Form 4473's for the purchase of the firearms. Further, if LANDAVERDE-Sosa were to be believed, "Barroso has

had an extramarital relationship with a female from Laredo, Texas LANDAVERDE-Sosa knew as Brenda" –implying that Brenda was more involved than the agents saw fit to determine.

e. Even if everything the two women said were true, those statements do not impute knowledge to Mr. Bruggeman. The only thing their statements support is that the three people (Ruiz, Barroso, and LANDAVERDE-Sosa were involved in making fraudulent purchases of firearms. By contrast, Bruggeman's meticulous record keeping (especially in filing the form 3310's) is the very thing that aided the agents in pursuing their investigation. The issue with the agents is that they pursued the wrong target.  A careful reading of the Agent Affidavit and his testimony reveals that Bruggeman's sharing of information with the agents was forthcoming; his volunteering of information about the purchases and the persons making them was equally forthcoming; and his communication both orally and by text messaging to the agents was the type of cooperation one would expect of an honest FFL dealer.  The above does not equate to "knowledge" on the part of Bruggeman as to straw purchases.  The targeting of his residence, his home, and the scope of items seized was overly broad and not warranted by the search warrant.

f. Finally, by following the agent's "instructions" and following thru with text messages to and from the agents and the purchasers, Bruggeman was effectively acting as an agent of the government—all over and beyond what would normally be required of an FFL dealer. (See hearing Exhibit 14 for text communications with Agent Guardado and the purchasers).

## IV.  The Scope of the Search

4.1    Attached as **Exhibit 2** is a copy of Attachment B to the search warrant at issue. The only items that could, *arguendo,* be legitimately authorized for seizure would have been

the items in paragraph 1 (d) of Attachment B to the warrant—namely, documents of the type required to be maintained by a firearms dealer reflecting the purchase, sale, or possession of firearms. ATF did not need a search warrant to obtain the documents pertaining to the sales because a licensed dealer is required to make those available on demand.  Defendant not only made the documents available, but he provided additional documents pertinent to the sale and not required to be produced.  If the agent determined that more was needed, all he had to do was ask.

   4.2 Instead of limiting the search to documents, as noted above, the search warrant authorized seizure of virtually every piece of property owned by Defendant both individually and his licensed shop-- property had nothing to do with the sales of the firearms at issue. Further, the premises authorized to be searched included virtually everything within the defendant's residence, his business, and "vehicles found to be under the control of the persons described."

   4.3 The focus of the search of Defendant's premises was upon the "straw purchase" allegation. For reasons set forth above, the search warrant was not valid because of misstatements and omissions of material facts that exceeded the bounds of the "good faith" exception relied upon by the government.  However, even if the Court should sustain the basic justification for the warrant, the scope of the search far exceeded the legitimate focus of the search, which was to retrieve documents maintained by the licensed firearms dealer relative to sales to the alleged "straw purchasers."

   4.4 In examination by the AUSA, Mr. Watt, several key points were raised as follows:

    a. When asked, Agent Guardado stated that he was not asking to search a particular

person but, rather, "No, this was a residential search warrant." (Tr. Day 2: p. 35. ll. 19-23)

    b.    The agent further answered, "Correct" to the question that the crimes being investigated "would specifically be the ones that you documented in Paragraph 4 of your affidavit, that being the Title 18 United States Code 922(g)(5)." (Tr. Day 2: p. 39. ll. 1-4

    c.    The agent admitted that he had made a mistake when in Paragraph 4 of he cited the magistrate 18. U.S.C. §544 that should have been §554, because it was a typo. (Tr. Day 2: P. 39. ll. 13-19).

    4.5    Further examination by Mr. Watt proceeded as follows:

Q    If the FFL is "in on it," I guess, if you will, is it possible for the FFL to submit valid information on a 4473, receive a NICS approval, and transfer a firearm to an individual that is not the person contained on the 4473?

A    ***I think it's possible.*** [Emphasis added.]

Q    If the FFL then completed the -- again, completed the 4473, obtained the NICS check, that person did it multiple times and they completed the -- both the transaction report and submitted that, correct? It's possible?

A    Correct. They would be required to do that.

Q    And so, because the FFL submitted all of the paperwork, in that scenario, would the FFL have committed a crime?

A    ***If he knowingly -- knew that it wasn't the person, correct.*** [Emphasis added.]

(Tr. Day 2: p. 53-54, ll. 23-25 and 1-12)
*****************************************

There is no evidence in warrant affidavit or elsewhere that Mr. Bruggeman "knew" that the buyers "weren't the person." Again, the agent's statement that "I think it's possible" does not rise to "probable," and even if he said it would be "probable," it is not supported by evidence.

    4.5    The search was overly broad and violated the fundamental tenants of the 4th

15

Amendment. As a result, under the principles enunciated by United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), as well as countless other decisions of the United States Supreme Court and the various lower federal courts, the exclusionary rule applies. *Terry* involved a warrantless search of a person that was upheld by the Supreme Court. Nevertheless, the Court clearly enunciated the exclusionary rule as follows:

> "Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere. Under our decision, courts still retain their traditional responsibility to guard against police conduct *which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires.* When such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials. And, of course, our approval of legitimate and restrained investigative conduct undertaken on the basis of ample factual justification should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate." *Id.* at 25-26.

### V. Summary and Conclusion

5.1     A review of the Agent Affidavit and agent Guardado's testimony in totality reveal the following:

a.      There was a material and substantial misleading and reckless disregard for the truth as to what constitutes a "straw purchase;"

b.      There are material misrepresentations (actual and through omissions) of facts given as basis for the warrant—e.g., the agent's emphasis on "discrepancies" in signatures that were obviously similar and his statements that he did not it deem it relevant to inform the magistrate about the full cooperation by Defendant.

c.      There were omissions that were material to a substantiation of probable cause. Among other things, the Agent Affidavit does not set forth the various permissible

circumstances under which firearm sales may be made without rising to the level of straw purchases – for example, a gift—thereby, concealing from the Magistrate essential facts in this case that would have led to his reasonable questioning of the basis for the affidavit;

      d      In particular, there were admissions by the agent that it was "possible" that Defendant was aware of straw purchases even though he acknowledged that the Defendant's records were complete and correct and that he cooperated in all respects with the agents "instructions;"

In brief, "possible" is not "probable," and there is no credible evidence that gives rise to probable cause that Bruggeman, a licensed firearms dealer, had any intent to aid in a straw purchase.

## VI. Prayer

6.1    Defendant moves the admission of **Exhibit 1** attached for purposes of this hearing.

6.2    For reasons set forth in the Motion to Suppress and above, the Agent Affidavit for the search warrant does not state probable cause as to Defendant Bruggeman and does not authorize the overly broad scope of the search and seizure of the personal and business premises of Defendant. Therefore, Defendant renews his request that the Court suppress all the seized evidence.

                                             Respectfully submitted,

                                             By: */s/ Paul G. Kratzig*
                                             Paul G. Kratzig
                                             Texas State Bar No. 11710500
                                             S.D. TX Admission No. 7593
                                             The Kratzig Law Firm
                                             615 N. Upper Broadway, Suite 900
                                             Corpus Christi, Texas 78401
                                             Telephone: 361-888-5564
                                             email: paul@kratzig.com

By: /s/ *Ron Barroso*
Ron Barroso
Texas State Bar No. 01827600
S.D. TX Admission No.*
5350 S. Staples Street, Suite 438
Corpus Christi, Texas 78411-4682
Ph (361)-994-7200
email: rbarrosolaw@interconnect.net
**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I certify that on this 10th day of April 2023, a copy of the foregoing document was served upon the following counsel of record, by either: (1) the Court's Electronic Filing System, pursuant to Local rule 5.1, if they have consented to electronic service, or (2) by email if they have not so consented.

/s/ *Paul G. Kratzig*
Paul G. Kratzig

Lance Andrew Watt
Assistant U.S. Attorney
800 N. Shoreline, Suite 500
Corpus Christi, TX  78401
Email: lance.watt@usdoj.gov

John George Edward Marck
Assistant U.S. Attorney
800 N. Shoreline, Suite 500
Corpus Christi, TX  78401
Email: john.marck@usdoj.gov